**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
Randy K. Jones, SBN 141711
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1500
Email: *rkjones@mintz.com*

Daniel J. Goodrich, BBO 692624 (*Pro Hac*)
Ryan Dougherty, BBO 703380 (*Pro Hac*)
1 Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
Email: *djgoodrich@mintz.com*
         *rtdougherty@mintz.com*

*Attorneys for Mark Manoogian*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 18-CR-4683-GPC |
| Plaintiff, | Honorable Gonzalo P. Curiel |
| v. | **SENTENCING MEMORANDUM ON BEHALF OF MARK MANOOGIAN** |
| MARK MANOOGIAN | |
| Defendant. | |

Defendant, Mark Manoogian, through his counsel, respectfully submits this Sentencing Memorandum ahead of his sentencing on October 3, 2022.

**I.   Introduction**

Defendant Mark Manoogian entered a guilty plea before this Honorable Court on June 10, 2022, to one count of Title 18 U.S.C. § 1037(a)(5) and (b)(3), electronic mail fraud, a misdemeanor. Mr. Manoogian files this sentencing memorandum and requests this Court to follow the joint recommendation by the parties and the probation officer to not impose custody in this case. He

requests, as well, that the Court not impose a period of probation. He makes his request on the basis that for his entire life, Mr. Manoogian has been a hardworking, law-abiding, and honest member of society. He is a loving, kind, caring and devoted husband, father, son, and brother. He recognizes that his failure to speak up and act, even in the face of clear directives from his superiors, was wrong. This decision will haunt him forever. He is truly remorseful and fully accepts responsibility for his actions in this matter.

Mr. Manoogian respectfully requests that the Court not impose a period of probation on the basis that this federal investigation and prosecution has hung and weighed heavily on his mind for seven years. For the past five years, he has been under pre-trial supervision without incident. During this time, his family life has been severely disrupted – Mark has not spent one day with his wife and two young boys, Max and Theo, without the stress and uncertainty of being under criminal indictment. This case has taken an immense toll on Mark's physical, emotional, and mental well-being. This misdemeanor conviction has also cost him his job and his career, and has had a negative effect on his ability to pursue future job opportunities.

Mr. Manoogian recognizes that the Court has broad discretion in determining an appropriate sentence. Although Mark has agreed to pay a fine, he respectfully requests that the Court consider the totality of the facts and circumstances in determining whether or not a fine should be imposed, including the fact that there are no definable victims or financial losses in this case (the loss in this case is based upon the amount of money Adconion paid Daniel Dye for the IP netblocks.) As discussed below, Mr. Manoogian believes that a sentence of 100 hours of community service with no supervised release or probation is "no greater punishment than necessary to serve the sentencing goals" and will allow him and his family the chance to put this unfortunate and dark chapter behind them, and live happy and productive lives.

**II.     Background and Character of Mark Manoogian**

Mark is a 39-year-old resident of Carlsbad, California. He is a dedicated and caring family man with no prior criminal history. He was born and raised in North Attleboro, Massachusetts. He grew up in a household with two loving parents, David and Judy Manoogian (married for 45 years), older brother Matthew (a federal law enforcement agent), and younger sister, Alexandra. Mark and

his family lived down the road from his maternal and paternal grandparents, who were important positive role models in his life. His parents instilled in their children the values of love of family, humility, education, and hard work. Mark remains incredibly close with his parents, siblings, and members of his extended family to this day.

Mark was an accomplished high school student-athlete who lettered in four varsity sports. Mark's brother remembers him as a "talented athlete who was the ultimate teammate and friend." *See* attached letter of Mr. Matthew Manoogian. Although Mark achieved numerous citizenship, athletic, and academic accomplishments, his father specifically highlights his son's compassion and empathy. *See* attached letter of Mr. David Manoogian. He states in his letter to the Court that Mark was the type of kid that would come to the aid of students who were being bullied.

After high school, Mark attended Tulane University on an academic scholarship. After graduation from college, Mark followed in his father's footsteps and became a lawyer, graduating from New England Law School in 2008. Instead of practicing law, however, Mark and a law school classmate started a business developing a website that helped consumers make purchasing decisions.

In 2009, Mark met his future wife, Nicole (Niki). In 2011, Niki was offered a job in San Diego that would bring her closer to her family in California. Mark dropped everything he was doing and moved across the country to be with Niki. The couple were married shortly thereafter and have been blessed with two wonderful boys, Max (5) and Theo (3).

Mark is a dedicated and devoted husband as well as loving father. Recently, Max was diagnosed with autism which requires intensive therapy with specialists for approximately 15-20 hours per week. This diagnosis occurred in the months immediately leading up to the trial in this case. Max's diagnosis shook Mark to his core and put extra emotional and mental stress on him and his family. Despite the mental anguish and emotional turmoil, Mark and Niki have engaged some of the top medical professionals in San Diego on Max's behalf and are committed to ensuring that Max lives a happy, successful, and productive life.

Mark's love of family has been shown in a variety of other ways. For instance, his brother Matthew recalls that when Matthew's son was born, Mark flew to Tucson to be with his brother and sister-in-law and to meet his newly born nephew. Mark spent the next several days cleaning the house

and caring for the family. As Matthew states, "Mark has always been selfless with a unique ability to easily love those close to him unconditionally and sacrificially." *See* Mr. Matthew Manoogian letter.

### III. Nature and Circumstances of the Offense

Mark was hired by Adconion (now known as Amobee) in October 2011. At the time he was hired, Mark had no experience or prior training in the digital marketing industry. He was not a "tech guy" nor an "IT guy." He accepted the job partly because he needed the paycheck to help support his family, but more so because he is a team-oriented person and wanted to be a part of an exciting, fast-growing company with a group of "twenty-something" year-old, enthusiastic, and fun employees who were led by a dynamic and young CEO, Kim Perell. Although Mark was hired as a Business Development Manager, he was a "Manager" in name only, as he did not "manage or supervise" any employees. His position was a relatively low-level job with the primary responsibility of negotiating leases for IP addresses on behalf of the company. Prior to this job, Mark had never leased or acquired IP addresses. He was trained by and reported to Adconion's General Counsel, Jonathan Harrill. Mark was neither a company decision-maker nor part of the company's leadership team. Every transaction he was involved in required Mark to obtain prior approval from Adconion's legal counsel and/or finance team. With the exception of some of Adconion's later GetAds IP netblock purchases, Mark's work involved only the leasing of IP addresses.

In December 2010, ***nearly a year before Mark was hired***, Adconion, through Perell and other senior management executives, purchased IP netblocks from Daniel Dye. Dye was a Vice President at GetAds and an IP address broker. GetAds was a long-time client of Adconion's and had a good reputation in the digital advertising business. Prior to this occasion, Adconion had never purchased IP addresses from Dye or anyone else. Dye told Perell and Adconion leadership that he owned the IP netblock and that he would sell Adconion, "IP space that you own." Dye also represented to Adconion that the company would be "purchasing" the IP netblock and all of its associated rights, *e.g.*, domain name, letter of authorization (LOA), etc.

Based on Dye's representations, Adconion purchased its first netblock from GetAds in March 2011, ***approximately seven months prior to Mark being hired at Adconion***. Dye orchestrated the entire deal: from providing the purchase and sale documents and LOAs, to coordinating with internet

hosting companies to get the netblocks "announced," making them "usable" on the internet. The transaction was reviewed and approved by Adconion's and GetAds' respective legal counsels. ***Mark had no involvement in the negotiation or approval of this purchase.***

In August 2012, Adconion purchased a second netblock from Dye and GetAds. Just like the first transaction, Dye spearheaded the entire process and provided an LOA directly to internet hosting companies without Adconion's involvement. Adconion's lawyers reviewed the purchase and sale documents and approved this transaction as well. ***Mark had no involvement in the negotiation or approval of this purchase.*** He was only involved with contacting, as directed, the internet hosting company and confirming that the hosting company could announce the IP addresses with the LOA that had been provided to the company by Dye. There were no red flags raised with Mark to indicate there was anything illegal or unethical about this transaction.

From August 2012 to October 2013, Mark was involved in a total of eight of the transactions between Adconion, Dye, and GetAds. At some point, Mark believed that Dye and GetAds were likely not the owners of the IP netblocks they sold to Adconion and that Dye and GetAds did not have actual authority to use and/or sell the IP netblocks to Adconion. He later learned that Dye was procuring abandoned IP netblocks from defunct or dormant companies, and selling those IP netblocks to Adconion. In hindsight, Mark knows that his actions in helping to facilitate the announcement of the GetAds IP netblocks, and his failure to speak up to management after he suspected that Dye and GetAds were not in fact the true owners of the IP netblocks, was wrong. For this he is truly remorseful and he accepts responsibility.

**IV.   Requested Sentence and Conclusion**

Based on the written plea agreement, the parties have agreed to the following advisory guideline calculations:

1. Base Offense Level            6
2. Amount of Loss                +12
3. Acceptance of Responsibility  -3
4. Combination of Factors        -7

5
MARK MANOOGIAN SENTENCING MEMORANDUM

The parties agree that Mr. Manoogian's Adjusted Offense Level is 8. He has no prior criminal history which places him in a Criminal History Category I. The Resulting Guideline Range is 0-6 months.

Counsel respectfully requests that the Court consider the following factors in determining whether a fine is appropriate in this case:

(1) Mr. Manoogian has no prior criminal history.

(2) As outlined above, Mr. Manoogian's role in this offense was minimal.

(3) Mr. Manoogian had no financial incentive nor did he receive any personal benefit, *i.e.*, no acquisition bonus or increase in pay, for his involvement in facilitating the use of the netblocks.

(4) There are no definable "victims" in this case who were harmed. None of the purported victims suffered any significant financial or monetary loss as a result of Adconion's use of the netblocks. In fact, most of the purported owners were unaware that they had any interest at all in the netblocks until they were informed by the FBI, which occurred long after Adconion had stopped using the netblocks. Some of the purported owners greatly benefitted financially to the tune of hundreds of thousands of dollars as a result of Adconion's use of the netblocks. In other words, had Adconion not purchased and used the netblocks, the purported owners would have never been aware that they still had an ownership interest in the netblocks and would have never been able to sell the netblocks for massive profits.

(5) Mr. Manoogian had no role or decision-making authority in deciding *what* emails were sent by Adconion, *to whom* the emails were sent, or the content of the emails.

(6) Mr. Manoogian has already paid a significant price professionally, mentally, emotionally and financially for his involvement in this matter. Along with the constant stress and pressure of being under criminal investigation since 2015, Mark has lost his career and the fellowship of friends that he worked with and cared for. He also suffers from depression as a result of this ordeal.

(7) Finally, to add insult to injury, the government's malicious, inaccurate and inflammatory statements to the press, ***the day after the guilty plea in this case was entered***, unfairly

characterize Mr. Manoogian's role in the offense and have further damaged his professional reputation. The prosecutors in this case continue to attempt to portray Mark as a "spammer," which the Court ruled during pre-trial hearings they were not permitted to do. However, in the government's recent press release, it identifies Mr. Manoogian as a "spammer" and includes salacious and sensational references to pornography that this Court explicitly stated were neither relevant nor admissible at trial. The government intentionally included in this press release references to inaccurate, careless and prejudicial language that have caused additional emotional and professional harm to Mr. Manoogian and have affected his ability to obtain gainful employment.

In conclusion, Mr. Manoogian fully accepts responsibility for his actions in this matter. As his brother Matthew eloquently states in his letter of support, "Mark has learned a great deal from this matter. He is eager to move on with renewed perspective and higher standards for himself in all facets of life, personally as a father, husband, protector, and role model, as a citizen and community member, and professionally in any future endeavors." *See* Mr. Matthew Manoogian letter.

Given the nature and circumstances of the offense and characteristics of the defendant, counsel submits the appropriate sentence is 100 hours of community service and a fine of no more than $100,000. Mr. Manoogian urges the Court to consider whether the recommended fine amount is harmonious with his involvement in the crime. For the reasons stated above, counsel does not believe that probation or supervised release is appropriate. We submit that the sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment and adequate specific and general deterrence. Further, the sentence generally comports with the statutory goal of imposing a punishment that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: September 26, 2022                **MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C**.

*s/ Randy K. Jones*
Randy K. Jones
Daniel J. Goodrich (Pro Hac)
Ryan Dougherty (Pro Hac)
*Attorneys for Mark Manoogian*

# CERTIFICATE OF SERVICE

Counsel for the Defendant certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Melanie K. Pierson
Assistant U.S. Attorney
880 Front Street, Rm 6293
San Diego, CA 92101
melanie.pierson@usdoj.gov

Sabrina Feve
Assistant U.S. Attorney
880 Front Street, Rm 6293
San Diego, CA 92101
sfeve@usa.doj.gov

Candina S. Heath
Department of Justice
1301 New York Avenue NW, Suite 600
Washington, DC 20530
candina.heath2@usdoj.gov

*s/ Randy K. Jones*
Randy K. Jones
Attorney for Mark Manoogian